## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Case No. 14 B 32138 |
| LDR INDUSTRIES, LLC, | ) | |
| | ) | |
| Debtor. | ) | Chapter 11 |
| ———————————————— | ) | |
| | ) | |
| LDR INDUSTRIES, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | Adv. No. 16 A 404 |
| | ) | |
| v. | ) | |
| | ) | Judge Pamela S. Hollis |
| THE HANOVER INSURANCE COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

This matter comes before the court on the Cross-Motions for Summary Judgment filed by Plaintiff LDR Industries, LLC ("LDR") and Defendant The Hanover Insurance Company ("Hanover"). In the underlying complaint, LDR seeks a declaratory judgment that any obligation it has to Hanover under a certain Customs bond is not secured by a letter of credit. Having reviewed the Joint Statement of Material Facts, the exhibits on the Joint Exhibit List, and the memoranda of law filed by the parties, the court denies LDR's motion for summary judgment and grants Hanover's motion for summary judgment.

## JURISDICTION

As stated below in the Findings of Fact, the parties agree that the court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334, and that it is a core proceeding under 28 U.S.C. § 157(b)(2).

## FINDINGS OF FACT

LDR and Hanover stipulated to 61 facts, all of which are included below. The parties also submitted 26 disputed facts. The court reviewed each of these disputed facts and, where appropriate, found certain of these facts to be both relevant and undisputed. Only those relevant and undisputed facts are included below. The court also made its own findings of fact.

1. On September 2, 2014 (the "Petition Date"), LDR filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq. See* LDR's Complaint for Declaratory Relief (**Joint Exhibit 1**), ¶ 5; Hanover's Amended Answer and Affirmative Defenses to Complaint for Declaratory Relief (**Joint Exhibit 2**), ¶ 5; Declaration of David Pollans (**Joint Exhibit 3**), ¶ 2.

2. Following the Petition Date, LDR remained in possession of its assets and continued to operate its business as a debtor in possession in accordance with 11 U.S.C. §§ 1107 and 1108 in the above-captioned case. **Joint Exhibit 1**, ¶ 5; **Joint Exhibit 3**, ¶ 3.

3. LDR proposed and confirmed a liquidating chapter 11 plan in its chapter 11 proceeding in 2016. The terms of that plan included the formation of a Liquidating Trust. Following confirmation of the plan, LDR's assets, including this lawsuit, were transferred to the LDR Liquidating Trust, which is the successor to LDR as the plaintiff in this adversary proceeding. **Joint Exhibit 3**, ¶ 4.

4. LDR was an Illinois limited liability company whose principal place of business was located in Chicago, IL. **Joint Exhibit 1**, ¶ 3; **Joint Exhibit 3**, ¶ 6.

5. Hanover is an insurance company with a principal place of business located in Worcester, Massachusetts. A portion of Hanover's business involves the issuance of Customs bonds

for persons engaged in the importation of foreign goods into the United States. **Joint Exhibit 1**, ¶ 4; **Joint Exhibit 2**, ¶ 4. Affidavit of Mark Statter (**Joint Exhibit 6**), ¶ 4.

6. For this particular market, Hanover engaged a managing general agency to oversee the issuance of the majority of its Customs bonds. Hanover's agent in this particular matter was Trade Risk Guaranty ("TRG"). **Joint Exhibit 6**, ¶ 4. TRG held itself out as Hanover's agent for its Customs bond business. **Joint Exhibit 3**, ¶ 12; **Joint Exhibit 23**, ¶ 12; **Joint Exhibit 24**, pp. 18:23-19:1.

7. At all times relevant to this matter, TRG had authority to issue Customs bonds up to and including $500,000. **Joint Exhibit 6**, ¶ 5.

8. This court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). **Joint Exhibit 1**, ¶ 1.

9. Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1408 and 1409. **Joint Exhibit 1**, ¶ 2; **Joint Exhibit 2**, ¶ 2.

## TRANSACTIONS BETWEEN LDR AND HANOVER

10. LDR was formerly in the business of importing and distributing plumbing fixtures and supplies. LDR bought products from both foreign and U.S. companies and distributed them to retail stores such as Home Depot and Sears. **Joint Exhibit 3**, ¶ 6.

11. In order to import goods, LDR was required to obtain a Customs bond from a third-party surety. LDR imported goods under a continuous entry Customs bond, which typically had a term of one year. **Joint Exhibit 3**, ¶ 7.

12. Continuous entry Customs bonds automatically renew for additional annual periods unless they are terminated. **Joint Exhibit 3**, ¶ 8.

13. Certain types of goods imported by LDR were subject to antidumping and countervailing duties imposed by U.S. Customs and Border Protection ("Customs"). There is often a lag of several years after goods are imported before the amounts of antidumping and countervailing duties to be assessed are determined. **Joint Exhibit 3,** ¶ 10.

**The First Customs Bond**

14. For some years prior to June 2011, LDR had imported goods under a Customs bond in the amount of $200,000 issued by Washington International Insurance Company ("Washington International"). Washington International required LDR to post an irrevocable letter of credit in favor of Washington International in the amount of $200,000 in order to issue this bond. **Joint Exhibit 3,** ¶ 11.

15. In 2011, LDR was solicited by a representative of TRG to switch bonding companies from Washington International to Hanover. **Joint Exhibit 3,** ¶ 12.

16. TRG had authority to issue customs bonds up to and including $500,000. Anything lower than that amount did not require prior approval from Hanover. **Joint Exhibit 6,** ¶¶ 5-6.

17. TRG offered that Hanover would charge a lower premium for providing a bond in the same amount as Washington International, and that LDR would not have to post a letter of credit or other collateral to secure the bond. **Joint Exhibit 3,** ¶ 13.

18. Both the favorable pricing and the lack of required security were material to LDR's decision to change surety companies. **Joint Exhibit 3,** ¶ 14.

19. At all relevant times, David Pollans was the Vice President of Finance at LDR and was involved in dealing with TRG for obtaining a $200,000 Hanover Customs bond in 2011. One of Pollans' responsibilities at LDR was to ensure that the company had an appropriate Customs bond in place to enable it to import goods. **Joint Exhibit 3,** ¶¶ 5, 9, 15.

4

20. On June 9, 2011, he signed Hanover's Customs bond application form for a $200,000 bond on behalf of LDR (the "First Bond Application"). **Joint Exhibit 3**, ¶15; **Joint Exhibit 6**, ¶ 8; **Joint Exhibit 7**.

21. The First Bond Application was on a form provided by Hanover, and LDR did not negotiate any of its terms. **Joint Exhibit 3**, ¶ 16; **Joint Exhibit 7**.

22. The First Bond Application contains a section entitled "General Agreement of Indemnity" (the "First Indemnity Agreement"). Among other things, the First Indemnity Agreement requires the applicant to pay premiums and indemnify Hanover against any loss in connection with the bond. **Joint Exhibit 6**, ¶ 8; **Joint Exhibit 3**, ¶ 17; **Joint Exhibit 7**.

23. The First Indemnity Agreement also states that because of LDR's request and promise to execute it, it applies to obligations that Hanover "has assumed or may in the future assume suretyship on bonds, or other obligations." **Joint Exhibit 7**.

24. In the First Indemnity Agreement, LDR agreed to "completely INDEMNIFY [Hanover] from and against any liability, loss, costs, attorneys' fees, and expenses whatsoever which [Hanover] shall at any time sustain as surety on any of said bonds, or for the enforcement of this agreement." **Joint Exhibit 6**, ¶ 10.

25. The First Indemnity Agreement also provided that, upon demand by Hanover, LDR would "deposit current funds with [Hanover] in amount sufficient to satisfy any claim against [Hanover] by reason of such suretyship." **Joint Exhibit 6**, ¶ 11.

26. The First Indemnity Agreement notes that "Collateral may be required for certain bonds." **Joint Exhibit 6**, ¶ 12; **Joint Exhibit 3**, ¶ 18; **Joint Exhibit 7**.

27. Despite this notation that "[c]ollateral may be required for certain bonds," Hanover did not require LDR to provide security, including a letter of credit, at the time the First Customs

Bond was issued.  LDR did not cause a letter of credit to be issued or other security to be

posted in favor of Hanover at the time the First Customs Bond was issued.  **Joint Exhibit**

**7**; **Joint Exhibit 3**, ¶ 21.

28. Hanover issued a continuous entry Customs bond, Bond No. 9911-Q7481 (the "First

Customs Bond"), to LDR, as principal, for the benefit of Customs effective as of June 28,

2011.  The First Customs Bond was in the annual amount of $200,000, and it remained in

effect until it was terminated on August 16, 2012.  **Joint Exhibit 6**, ¶ 14; **Joint Exhibit 3**,

¶ 20: **Joint Exhibit 8**.

29. The First Customs Bond was a continuous bond, which meant that it renewed each year

unless or until terminated.  **Joint Exhibit 6**, ¶ 15.

30. The First Customs Bond was in effect for two annual periods – (i) initially for the one-

year period from June 28, 2011 to June 27, 2012, and (ii) thereafter renewed for a partial-

year period from June 28, 2012 to August 16, 2012.  **Joint Exhibit 1**, ¶ 20; **Joint Exhibit**

**3**, ¶ 22, **Joint Exhibit 6**, ¶ 16.

**The Second Customs Bond**

31. On or about July 16, 2012, Customs issued a letter to LDR (the "Deficiency Letter")

referencing the First Customs Bond and notifying LDR that the First Customs Bond was

no longer sufficient to protect the revenue and insure compliance with Customs laws and

regulations.  The Deficiency Letter notified LDR that it was required to increase the

amount of its Customs bond to at least $1,500,000 within 30 days in order to continue

importing goods.  **Joint Exhibit 3**, ¶ 23; **Joint Exhibit 6**, ¶¶ 17, 18; **Joint Exhibit 9**.

32. In the latter part of July 2012, Mesirow Financial became involved as LDR's insurance

broker to deal with obtaining a larger Customs bond.  Thereafter, Jacqui Norstrom, along

with others at Mesirow Financial, dealt with TRG regarding Customs bond issues on behalf of LDR. **Joint Exhibit 3,** ¶ 24.

33. Upon Hanover's receipt of a copy of the Deficiency Letter, Josh Froberg of TRG reached out to Hanover's bond manager, Mark Statter, regarding the increased risk to Hanover that could result from the LDR Customs bonds. **Joint Exhibit 6,** ¶ 19.

34. Froberg recommended obtaining an Irrevocable Letter of Credit ("ILOC") in the amount of $1,500,000. **Joint Exhibit 6,** ¶ 19.

35. Statter agreed with Froberg's recommendation to obtain an ILOC from LDR to protect Hanover, and TRG notified LDR that Hanover required LDR to post security in the form of an ILOC in order for Hanover to increase its bond amount to $1,500,000. **Joint Exhibit 3,** ¶ 25; **Joint Exhibit 6,** ¶ 20. Hanover ultimately agreed to accept an ILOC in the lesser amount of $1,200,000 as an accommodation to LDR. **Joint Exhibit 6,** ¶ 20.

36. TRG provided LDR with Hanover's form letter of credit and told LDR that the letter of credit must conform to this form. **Joint Exhibit 3,** ¶ 28; **Joint Exhibit 10**; **Joint Exhibit 24**, p. 33:12-18.

37. The form letter of credit did not specify to which bond the letter of credit applied. LDR provided this form to its bank, J.P. Morgan Chase Bank ("JPMC"). **Joint Exhibit 3,** ¶ 28; **Joint Exhibit 10**; **Joint Exhibit 6,** ¶ 28.

38. On behalf of LDR, on August 2, 2012, Pollans signed Hanover's form application for the Second Customs Bond in the amount of $1,500,000, and returned it to TRG (the "Second Bond Application"). **Joint Exhibit 3,** ¶ 31; **Joint Exhibit 12**; **Joint Exhibit 6,** ¶ 21.

39. The Second Bond Application was on a form provided by Hanover and it was substantially similar to the First Bond Application.  **Joint Exhibit 3, ¶¶ 31-32; Joint Exhibit 12**.

40. The Second Bond Application contains a section entitled "General Agreement of Indemnity" (the "Second Indemnity Agreement") which states that Hanover, "at the special instance and request of [LDR] and because of the promise of [LDR] to execute this indemnity agreement, has assumed or may in the future assume suretyship on bonds, or other obligations."  **Joint Exhibit 6, ¶ 22**.

41. In the Second Indemnity Agreement, LDR agreed to "completely INDEMNIFY [Hanover] from and against any liability, loss, costs, attorneys' fees, and expenses whatsoever which [Hanover] shall at any time sustain as surety on any of said bonds, or for the enforcement of this agreement."  **Joint Exhibit 6, ¶ 23**.

42. In the Second Indemnity Agreement, LDR agreed to "deposit funds as soon as [Hanover] has determined that liability exists under any bond written for the Undersigned, regardless of whether a payment has been issued or reserve booked.  Payment shall be made by the Undersigned within 15 days."  **Joint Exhibit 6, ¶ 24; Joint Exhibit 12**.

43. Hanover issued a continuous entry Customs bond in the amount of $1,500,000, Bond No. 9912-KE970 (the "Second Customs Bond") on LDR's behalf.  The Second Customs Bond went into effect as of August 17, 2012.  The Second Customs Bond remained in effect for two annual periods, through August 16, 2014.  **Joint Exhibit 3, ¶ 30; Joint Exhibit 13; Joint Exhibit 6, ¶ 26**.

## THE LETTERS OF CREDIT

### The Original Letter of Credit

44. Hanover terminated the First Customs Bond effective as of August 16, 2012 and issued the Second Customs Bond effective as of August 17, 2012.  **Joint Exhibit 3, ¶ 33; Joint Exhibit 6, ¶ 26.**

45. LDR agreed to cause the ILOC to be issued shortly after the Second Customs Bond became effective.  **Joint Exhibit 3, ¶ 34.**

46. JPMC issued a $1,200,000 letter of credit in favor of Hanover, L/C No. TFTS-321562 (the "Original ILOC"), dated August 31, 2012.  **Joint Exhibit 6, ¶ 27; Joint Exhibit 14; Joint Exhibit 3, ¶ 35.**

47. The Original ILOC makes no reference to any specific bond number, bond amount, or bond period.  **Joint Exhibit 6, ¶ 28; Joint Exhibit 3, ¶ 35; Joint Exhibit 14.**  The Original ILOC states that "FUNDS UNDER THIS IRREVOCABLE LETTER OF CREDIT ARE AVAILABLE TO HANOVER."  **Joint Exhibit 6, ¶ 28.**

48. The Original ILOC states that it is a stand-alone document and that it

> SETS FORTH IN FULL THE TERMS OF OUR UNDERTAKING. SUCH UNDERTAKING SHALL NOT IN ANY WAY BE MODIFIED, AMENDED OR AMPLIFIED BY REFERENCE TO ANY DOCUMENT OR INSTRUMENT REFERRED TO HEREIN OR IN WHICH THIS IRREVOCABLE LETTER OF CREDIT IS REFERRED TO OR TO WHICH THIS IRREVOCABLE LETTER OF CREDIT RELATES AND ANY SUCH REFERENCE SHALL NOT BE DEEMED TO INCORPORATE HEREIN BY REFERENCE ANY DOCUMENT OR INSTRUMENT.

**Joint Exhibit 6, ¶ 29.**

49. Hanover approved the renewal of the Second Customs Bond in June 2013.  **Joint Exhibit 3, ¶ 36.**

50. The Second Customs Bond covered liabilities to Customs in connection with entries of

goods that LDR imported between August 17, 2012 and August 16, 2014. **Joint Exhibit**

**3, ¶ 44.**

## The Replacement Letter of Credit

51. In August 2013, LDR requested that Hanover accept a replacement letter of credit from

JPMC. One of the owners of LDR had personally secured the Original ILOC, and LDR

sought to have it replaced with a new letter of credit secured by its funds. **Joint Exhibit**

**3, ¶ 37; Joint Exhibit 6, ¶ 31.**

52. On August 26, 2013, Hanover's bond manager Mark Statter informed Josh Froberg of

TRG that Hanover had no objection to a replacement ILOC and that LDR would need to

provide a letter acknowledging that the replacement ILOC "covers all potential past,

present and future liabilities associated with LDR Industries, LLC's Customs Bond

Program." **Joint Exhibit 6, ¶ 32; Joint Exhibit 18.**

53. David Pollans of LDR does not recall receiving a request from either TRG or Hanover for

a letter stating that the replacement letter of credit would cover all potential past, present

and future liabilities associates with LDR Industries, LLC's Customs Bond Program.

**Joint Exhibit 3, ¶ 38.**

54. On September 3, 2013, Kristen Brandt of TRG wrote to Norstrom of Mesirow Financial to

tell Norstrom that with a replacement ILOC, "LDR Industries, LLC would need to provide

us with a statement that states that the 'newly issued ILOC covers all potential past,

present and future liabilities associated with LDR Industries, LLC's US Customs Bond

Program." **Joint Exhibit 27**, Ex. A-2 (at EOD 39).

55. LDR never provided such a letter to TRG or Hanover. **Joint Exhibit 3, ¶ 38.**

56. On October 31, 2013, Statter approved the draft ILOC, stating that it was to replace the Original ILOC posted by LDR. **Joint Exhibit 6, ¶ 33.** Hanover subsequently accepted a replacement letter of credit from JPMC, L/C No. CTCS 779468, dated as of November 7, 2013 (the "Replacement ILOC"). **Joint Exhibit 3, ¶ 39; Joint Exhibit 15; Joint Exhibit 6, ¶ 34.**

57. Hanover then returned the Original ILOC to LDR. **Joint Exhibit 3, ¶ 39; Joint Exhibit 23, ¶ 9.**

58. All material provisions of the Replacement ILOC remained the same as those in the Original ILOC. **Joint Exhibit 3, ¶ 40; Joint Exhibit 15; Joint Exhibit 6, ¶ 35.**

59. The Replacement ILOC was extended several times by JPMC. **Joint Exhibit 3, ¶ 41.**

**The Wintrust Letter of Credit**

60. In 2016, LDR replaced the Replacement ILOC with a letter of credit issued by Hinsdale Bank & Trust Company in favor of Hanover, No. SB162890027, in the amount of $1,200,000 (the "Wintrust ILOC"). **Joint Exhibit 3, ¶ 42; Joint Exhibit 16; Joint Exhibit 6, ¶ 36.**

61. The terms of the Wintrust ILOC are essentially the same as those of the Original ILOC and Replacement ILOC (collectively, the "Letters of Credit"). **Joint Exhibit 3, ¶ 43.** The Wintrust ILOC does not reference a bond number, bond amount, or bond period. Rather, it provides Hanover with $1,200,000 in collateral. **Joint Exhibit 6, ¶ 37.**

62. The Letters of Credit were all issued in Illinois. **Joint Exhibits 14, 15, 16.**

## LDR'S CHAPTER 11 CASE

63. Customs filed an amended claim in LDR's bankruptcy proceeding for duties and interest in the aggregate amount of $58,717,368.86 plus alleged unliquidated/contingent amounts. **Joint Exhibit 1, ¶ 14.**

64. A portion of these duties were assessed for entries that LDR had made during the time periods for which the First Customs Bond was in effect. **Joint Exhibit 3, ¶ 47.**

65. LDR disputed the merits of the Customs claim both before and after it filed for bankruptcy. Supplemental Pollans Declaration (**Joint Exhibit 4**), ¶ 7.

66. The Customs claim remained unresolved until LDR worked out a negotiated settlement of it in 2016. **Joint Exhibit 4, ¶ 8.**

67. LDR's chapter 11 plan incorporates the terms of the settlement it reached with Customs which does not provide for payment in full of the claim asserted against it by Customs. The plan also does not purport to limit Customs' ability to pursue claims against the sureties for LDR's Customs bonds.

68. Following the Effective Date of LDR's plan, Customs sent a demand for payment dated as of October 31, 2016, to Hanover stating that it owed the amount of $391,689.75 for duties and interest relating to entries made during the periods covered by the First Customs Bond.

69. Hanover paid $391,689.75 to Customs in late November, 2016. Hanover seeks to recover that amount from the Wintrust ILOC.

70. LDR asserts that Hanover has no right to draw on the Wintrust ILOC to recover the $391,689.75 from the Wintrust ILOC and that those funds should instead be released to LDR to distribute to creditors pursuant to its plan.

71. Hanover contends that, based on the General Agreements of Indemnity and each of the

Letters of Credit, the collateral posted by LDR applies to any and all bonds issued by, or

other obligations of Hanover. **Joint Exhibit 2**, Affirmative Defenses, ¶¶ 1-7.

72. Customs asserted no claims against the First Customs Bond before LDR filed its

bankruptcy petition. **Joint Exhibit 4**, ¶ 4.

73. Customs asserted no claims against the Second Customs Bond before LDR filed its

bankruptcy petition. **Joint Exhibit 4**, ¶ 6.

## LEGAL DISCUSSION

Summary judgment standard

The standard for a summary judgment motion is set forth in Fed. R. Civ. P. 56, made

applicable in bankruptcy proceedings via Fed. R. Bankr. P. 7056. Summary judgment is

appropriate under Rule 56 if the moving party shows that no genuine issue of material fact exists

and that it is entitled to prevail in the case as a matter of law.

In ruling on the motion, the court must draw all reasonable inferences from the

underlying facts in the responding party's favor. Matsushita Elec. Indus. Co., Ltd. v. Zenith

Radio Corp., 475 U .S. 574, 587 (1986); Parkins v. Civil Constructors of Illinois, Inc., 163 F. 3rd

1027, 1032 (7th Cir.1998). On cross-motions for summary judgment, the court must "construe

all inferences in favor of the party against whom the motion under consideration is made." Hess

v. Reg-Ellen Machine Tool Corp., 423 F. 3rd 653, 658 (7th Cir. 2005) (quotation omitted).

"Cross-motions must be evaluated together, and the court may not grant summary

judgment for either side unless the admissible evidence as a whole – from both motions –

establishes that no material facts are in dispute." Bloodworth v. Village of Greendale, 475 Fed.

Appx. 92, 95 (7th Cir. 2012) (citations omitted). A factual dispute is a genuine issue for trial only

if it is determinative of the outcome under governing law. <u>Anderson v. Liberty Lobby, Inc.</u>, 477

U.S. 242, 248 (1986).

<u>Contract interpretation</u>

The primary objective of contract interpretation is to give effect to the intent of the

contracting parties. <u>Gallagher v. Lenart</u>, 226 Ill. 2nd 208, 232 (Ill. 2007). As this court wrote in

<u>Szilagyi v. Chicago Am. Mfg., LLC</u> (<u>In re Lakewood Eng. & Mfg. Co., Inc.</u>), 459 B.R. 306, 328-

29 (Bankr. N.D. Ill. 2011), <u>aff'd sub. nom.</u> <u>Sunbeam Prod., Inc. v. Chicago Am. Mfg., LLC</u>, 686

F. 3rd 372 (7th Cir.), <u>cert. denied</u>, 568 U.S. 1076 (2012), the first issue is whether the documents

in question are clear and unambiguous.

> Traditional contract interpretation principles in Illinois require that[ ] an
> agreement, when reduced to writing, must be presumed to speak the intention of
> the parties who signed it. It speaks for itself, and the intention with which it was
> executed must be determined from the language used. It is not to be changed by
> extrinsic evidence.

<u>Air Safety, Inc. v. Teachers Realty Corp.</u>, 185 Ill. 2nd 457, 462 (Ill. 1999) (quotation omitted).

This is known as the "four corners" method of contract interpretation, and is the controlling

approach under Illinois law. <u>See</u> <u>Lease Mgmt. Equip. Corp. v. DFO P'ship</u>, 392 Ill. App. 3rd 678,

685–86 (Ill. App. Ct. 2009).

"In applying this rule, a court initially looks to the language of a contract alone. If the

language of the contract is facially unambiguous, then the contract is interpreted by the trial court

as a matter of law without the use of parol evidence." <u>Air Safety</u>, 185 Ill. 2nd at 462 (citations

omitted). <u>See</u> <u>Minn. Life Ins. Co. v. Kagan</u>, 724 F. 3rd 843, 849 (7th Cir. 2013) ("A court must

initially look to the language of a contract alone, as the language, given its plain and ordinary

meaning, is the best indication of the parties' intent.") (quotation and emphasis omitted).

If language in a contract is "reasonably or fairly susceptible to more than one

construction," it is ambiguous. <u>Tishman Midwest Mgmt. Corp. v. Wayne Jarvis, Ltd.</u>, 146 Ill.

App. 3d 684, 689 (Ill. App. Ct.1986) (citation omitted). But a contract is not ambiguous merely because the parties disagree on its meaning. <u>Continental Mobile Tel. Co. v. Chicago SMSA Ltd. P'ship</u>, 225 Ill. App. 3rd 317, 323 (Ill. App. Ct. 1992).

If the language is ambiguous, then and only then may parol evidence – evidence from outside the contract's four corners –be considered to resolve the ambiguity. <u>See</u> <u>State Bank of Toulon v. Covey</u> (<u>In re Duckworth</u>), 776 F. 3rd 453, 456 (7th Cir. 2014) ("Illinois adopts the familiar principle that an unambiguous contract is interpreted by the court as a matter of law without use of parol evidence.") (citation omitted).

If a contract is silent as to a particular term, it

> creates ambiguity . . . only when the silence involves a matter naturally within the scope of the contract as written. A contract is not ambiguous merely because it fails to address some contingency; the general presumption is that the rights of the parties are limited to the terms expressed in the contract.

<u>Consolidated Bearings Co. v. Ehret-Krohn Corp.</u>, 913 F. 2nd 1224, 1233 (7th Cir. 1990) (quotation omitted).

<u>The documents are unambiguous</u>

On June 9, 2011, LDR's Vice President of Finance David Pollans signed Hanover's one page Customs bond application form. LDR was seeking a $200,000 Customs bond from Hanover. The First Bond Application contained the First Indemnity Agreement, in which LDR agreed "to completely INDEMNIFY [Hanover] from and against any liability, loss, costs, attorney's fees, and expenses whatsoever which [Hanover] shall at any time sustain as surety on any of said bonds, or for the enforcement of this agreement."

The parties agree that this paragraph requires LDR to indemnify Hanover in the event it sustains a loss in its role as surety. <u>See</u> Plaintiff's Amended Reply Memorandum in Support of Its Motion for Summary Judgment (EOD 55), p. 5 ("Amended Reply"). But this provision alone

did not collateralize that indemnification obligation. During the term of the First Customs Bond,

Hanover did not require security, and LDR did not deposit funds, procure a letter of credit, post

real estate, or take any other action that collateralized its indemnification obligation.

The First Indemnity Agreement did provide, however, that upon demand by Hanover,

LDR would "deposit current funds with [Hanover] in amount sufficient to satisfy any claim

against [Hanover] by reason of such suretyship."

There is a similar clause in the Second Indemnity Agreement. Upon demand by

Hanover, LDR would be required to "deposit funds as soon as [Hanover] has determined that

liability exists under any bond written for [LDR], regardless of whether a payment has been

issued or reserve booked. Payment shall be made by [LDR] within 15 days."

These provisions are known as "collateral security" clauses, and the court finds both of

them to be unambiguous. "Illinois courts and other jurisdictions have routinely granted motions

for summary judgment in favor of a surety for specific performance of the collateral security

obligation of an indemnity agreement. Courts have traditionally analyzed the plain language of

the indemnity agreement to determine a surety's right to obtain specific performance of collateral

security." Hanover Ins. Co. v. Clark, 2006 WL 2375428, *5 (N.D. Ill. Aug. 15, 2006) (citations

omitted).

The collateral security clause in the First Indemnity Agreement provided that Hanover

could demand that LDR deposit funds in an amount sufficient to satisfy any claim Hanover had

to pay in its role as a surety. When it was time for a second bond, the language changed slightly,

which is entirely appropriate as there was now a history of Hanover providing bonds. Rather

than referring to funds that would be sufficient to satisfy "any claim," the amended language

required LDR to deposit funds "as soon as [Hanover] has determined that liability exists under

<u>any bond</u> written for [LDR]." (Emphasis added by the court.)

<u>LDR conflates the First Indemnity Agreement with the Second Indemnity Agreement</u>.

Therefore, the parties agreed that Hanover could demand a deposit of funds from LDR,

and that deposit would collateralize LDR's indemnification obligation.  Relying on the First

Indemnity Agreement, LDR argues that "if Hanover determined it had liability under its bond, it

was permitted to demand that LDR deposit 'cuurent [sic] funds' in an amount sufficient to

satisfy any claim against Hanover under the bond.  Hanover had no basis to make a

determination of such liability before Customs had asserted a claim on the bond."  Joint

Statement of Material Facts, ¶ 77.  Since Customs did not assert a claim until after the bond had

terminated, Hanover could not have made a determination of liability, so LDR concludes that the

Original ILOC did not fall under the collateral security provision.

But LDR is conflating the language of the <u>First</u> Indemnity Agreement with the language

of the <u>Second</u> Indemnity Agreement.  The First Indemnity Agreement required a deposit of funds

to satisfy <u>any claim</u>; it was the Second Indemnity Agreement that required a deposit as soon as

Hanover determined that liability existed under any bond.

<u>The court is not being asked to enforce the collateral security provision, only to interpret it</u>.

In its reply memorandum, LDR changes tack slightly.  It argues that two events must

have occurred before LDR was obligated to deposit funds under the collateral security provision:

(1) the existence of a claim or a determination of liability; and (2) a demand by Hanover for a

deposit of current funds.  Amended Reply, p. 6.  In support of this argument, LDR cites <u>Safeco

Ins. Co. v. DeMatos Enterprises, Inc.</u>, 2003 WL 21293825 (E.D. Pa. April 10, 2003) and

<u>Hanover Ins. Grp. v. Singles Roofing Co., Inc.</u>, 2012 WL 2368328 (N.D. Ill. June 21, 2012).

The <u>DeMatos</u> court found that "the only conditions precedent to Indemnitor Defendants'

obligation to provide collateral security are (1) that a claim has been made against a bond issued

by Safeco and (2) that Safeco has made a demand for collateral." <u>Id.</u> (citation omitted).

Similarly, in <u>Singles Roofing</u>, the indemnitor agreed to make payment to the surety "as soon as

liability exists or is asserted." 2012 WL 2368328, *3. "[T]he condition precedent to [the

indemnitor's] obligation to make payments was that claims be 'asserted against' Hanover." <u>Id.</u>

at *5.

LDR argues that because no claim had been made against the First Customs Bond prior

to Hanover's request for a letter of credit, nor had there been a determination of liability, and

there was no demand to deposit "current funds", the conditions precedent had not been satisfied

and LDR could not have been obligated to provide collateral to secure its obligation under the

First Customs Bond.

But the cases cited by LDR apply to the situation where a surety comes to court seeking

to <u>enforce</u> a collateral security provision, and to obtain specific performance of the indemnitor's

obligation to perform.

In this case, LDR has already deposited collateral. The question is whether the collateral

it posted applies retroactively to the First Customs Bond. The language of the First Indemnity

Agreement is unambiguous that upon demand, LDR could be required to deposit current funds in

amount sufficient to satisfy any claim. Hanover made a demand, and LDR posted the Original

ILOC. The court need not decide whether the conditions precedent to LDR's obligation to

deposit funds were satisfied, because it is not being called upon to enforce that obligation.

Instead, the court is deciding whether the collateral LDR posted secured its obligation under both

the First and Second Customs Bonds, or only the Second Customs Bond.

At least one prior decision found a similar obligation to post collateral in an indemnification agreement to apply retroactively to bonds issued in prior years.  In Great Am. Ins. Co. of New York v. International Custom Products, Inc., et al., 2011 WL 7037123 (W.D. Pa. Oct. 31, 2011), plaintiff Great American asked the district court to compel defendants International Custom and Dennis Raybuck to post $550,000 pursuant to a 2005 indemnification agreement.  International Custom and Raybuck argued that they could not be liable under the 2005 agreement for claims made against bonds issued in 2003 and 2004.

After summary judgment was entered against him, Raybuck asked the district court to reconsider its decision that the 2005 indemnity agreement, which included a collateral security provision, applied retroactively.  Following Pennsylvania contract law, which appears to be identical to Illinois contract law – the goal is to effect the intent of the parties, the meaning of a contract is drawn from its plain language, an ambiguity is found where a term is reasonably susceptible to different constructions, and disagreement among the parties does not constitute ambiguity – the court rejected Raybuck's argument.  "[T]he clear language of the contract requires Raybuck to indemnify Great American for any loss suffered which results from Great American's past or future assumption of suretyship on bonds. It also requires Raybuck, upon demand by Great American, to deposit sufficient funds to satisfy any claim against Great American by reason of such suretyship."  Id. at 3 (emphasis in original).

Similarly, the language of the First Indemnity Agreement required LDR to indemnify Hanover "from and against any liability, loss, costs, attorneys' fees, and expenses whatsoever which [Hanover] shall at any time sustain as surety on any of said bonds."  It also required LDR, upon demand by Hanover, to "deposit current funds with [Hanover] in amount sufficient to

satisfy any claim against [Hanover] by reason of such suretyship". As the Great American court found with nearly identical phrasing, this language is clear and unambiguous.

When the Great American court found the language to be unambiguous, it enforced the indemnity agreement and required Raybuck to post collateral for earlier-in-time bonds. In this case, LDR has already posted collateral. Based on the unambiguous language of the indemnity agreement, the collateral LDR posted upon demand applies retroactively to the First Customs Bond.

Collateral may be required for certain bonds.

Moreover, even if LDR's submission of the Original ILOC was not a performance under the collateral security provision, both the First and Second Indemnity Agreements advised LDR that "Collateral may be required for certain bonds." Sometime in July or August 2012, after Customs notified LDR that the bond amount would have to increase, Hanover required LDR to furnish a letter of credit. In other words, it required collateral.

It simply makes sense that the parties intended the Letters of Credit would secure both the First and the Second Customs Bonds, and the primary objective of contract interpretation is to give effect to the intent of the contracting parties. While Hanover did not require a deposit of collateral at the time it issued the First Customs Bond, when its relationship with LDR was just beginning, it left open the possibility of securing the indemnification obligation with the collateral security provision and the note that "[c]ollateral may be required for certain bonds". Then, when Hanover's exposure increased dramatically, it required LDR to post collateral to secure its obligations to Hanover. After all, as the parties agreed, there is often a lag of several years after goods are imported before the amounts of antidumping and countervailing duties to be assessed are determined by Customs.

The Letters of Credit are not limited to a particular bond.

LDR argues that because it was not required to post a letter of credit to obtain the First

Bond, and because none of the Letters of Credit addressed which LDR obligations they secured,

"[t]he only reasonable interpretation of this silence is that the parties never agreed to alter the

original terms of the First Bond – that was not secured by a letter of credit." Amended

Memorandum (EOD 54), p. 7. For this argument, LDR cites Consolidated Bearings. "A

contract is not ambiguous merely because it fails to address some contingency; the general

presumption is that the rights of the parties are limited to the terms expressed in the contract."

Id. at 1233 (quotation omitted).

LDR also argues that because the Letters of Credit "unambiguously provide[] no

agreement that Hanover could draw on the Letters of Credit to satisfy LDR's obligation under

the First Bond, the only reasonable interpretation is that the parties did not make such an

agreement." Amended Memorandum, p. 8.

But the silence of the Letters of Credit regarding the bonds to which they apply does not

limit their application to the Second Customs Bond. Indeed, the Letters of Credit state that they:

> SET[] FORTH IN FULL THE TERMS OF OUR UNDERTAKING. SUCH
> UNDERTAKING SHALL NOT IN ANY WAY BE MODIFIED, AMENDED
> OR AMPLIFIED BY REFERENCE TO ANY DOCUMENT OR INSTRUMENT
> REFERRED TO HEREIN OR IN WHICH THIS IRREVOCABLE LETTER OF
> CREDIT IS REFERRED TO OR TO WHICH THIS IRREVOCABLE LETTER
> OF CREDIT RELATES AND ANY SUCH REFERENCE SHALL NOT BE
> DEEMED TO INCORPORATE HEREIN BY REFERENCE ANY DOCUMENT
> OR INSTRUMENT.

LDR and Hanover agree that the Letters of Credit make no reference to any specific bond

number, bond amount, or bond period. If the Original ILOC and its replacements referred to the

Second Customs Bond, but not the First, then LDR's argument might hold water. Instead, the

language of the Original ILOC expressly provides that "FUNDS UNDER THIS

21

IRREVOCABLE LETTER OF CREDIT ARE AVAILABLE TO HANOVER". There is

nothing ambiguous about this sentence, and there is no language in the Original ILOC or the

other Letters of Credit that <u>limits</u> them to the Second Customs Bond. Indeed, the Letters of

Credit instruct us not to refer to any outside documents.

As the Seventh Circuit wrote in <u>Consolidated Bearings</u>, "the general presumption is that

the rights of the parties are limited to the terms expressed in the contract." <u>Id.</u> at 1233. The

terms expressed in the documents governing the relationship between LDR and Hanover were

that upon demand by Hanover, LDR would be required to "deposit current funds . . . in an

amount sufficient to satisfy any claim . . ." and that "collateral may be required for certain

bonds." Hanover made a demand for a letter of credit. LDR posted the Original ILOC. Funds

under the Original ILOC were available to Hanover. In <u>Consolidated Bearings</u>, the parties made

"no agreement about the respective rights . . . upon cancellation; we conclude that the parties did

not intend one." <u>Id.</u> Similarly, the Original ILOC contained no agreement that it would be

limited to a particular bond, and neither did any of the other applicable documents, so it is

appropriate to conclude that the parties did not intend one.

<u>Since the contract language is unambiguous, the contract is interpreted as a matter of law without
the use of extrinsic evidence.</u>

The parties submitted extrinsic evidence regarding communications about the

Replacement ILOC. A representative of Hanover asked LDR for a statement confirming that the

Replacement ILOC "covers all potential past, present and future liabilities associated with LDR

Industries, LLC's Customs Bond Program," but no statement was ever furnished.

Whatever this unfulfilled request means, it is irrelevant. So too is LDR's motivation for

switching to Hanover as its bonding company. Since the language of the documents is

unambiguous, it is unnecessary to look outside the four corners of those documents for their

meaning.  LDR provided a deposit of funds when Hanover demanded it.  The Letters of Credit

posted as collateral contain no language limiting their application to one bond or another.

Since the language of the Indemnity Agreements unambiguously required LDR to deposit

current funds in amount sufficient to satisfy any claim, and noted that collateral might be

required for certain bonds, when LDR posted the Original ILOC it secured LDR's indemnity

obligation under both the First and Second Customs Bonds.

## CONCLUSION

The court finds that the language of the documents is unambiguous.  The Original ILOC

and its subsequent replacement letters of credit secure LDR's obligation to Hanover under the

First Customs Bond.  Therefore, LDR's motion for summary judgment will be denied, and

Hanover's motion for summary judgment will be granted.

Date:    _11/8/2018_                    _____
                                        PAMELA S. HOLLIS
                                        United States Bankruptcy Judge